# UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| | ) | |
| WILLIAM E. K. HATHAWAY, II, | ) | |
| | ) | Case No. 05-77916-SCS |
| *Debtor.* | ) | |
| | ) | |
| | ) | |
| OSB MANUFACTURING, INC., | ) | |
| | ) | APN 06-07030-SCS |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| WILLIAM E. K. HATHAWAY, II, | ) | |
| | ) | Chapter 7 |
| *Defendant.* | ) | |
| | ) | |

## MEMORANDUM OPINION

This matter came before the Court upon the Complaint to Determine Dischargeability of Debt under §§ 523(a)(2) and (a)(4) of the Bankruptcy Code, filed by OSB Manufacturing, Inc. ("OSB") in the above-captioned matter. At the conclusion of the trial, the Court took this matter under advisement. The Court has jurisdiction over these proceedings pursuant to 28 U.S.C. §§ 157(b)(2) and 1334(b). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. Upon consideration of the evidence, arguments presented by counsel at the trial, and pleadings submitted, the Court makes the following findings of fact and conclusions of law.

## I.  PROCEDURAL HISTORY

William E. K. Hathaway, II ("Hathaway") filed, by counsel, a petition under Chapter 7 of the Bankruptcy Code on November 25, 2005.  The § 341 Meeting of Creditors was held on December 20, 2005.  On February 14, 2006, a Complaint to Determine Dischargeability of Debt owed to OSB under §§ 523(a)(2) and (a)(4) was filed, which commenced the above-captioned Adversary Proceeding.  Hathaway received a Chapter 7 Discharge on February 28, 2006.

OSB's Complaint alleges that it is a pre-petition unsecured non-priority creditor in Hathaway's pending bankruptcy case.  OSB claims that Hathaway incurred debt against OSB through his fraudulent use of a corporate American Express card and Visa check card.  OSB claims that Hathaway made unauthorized personal charges on both cards, and embezzled United States Currency belonging to OSB.  OSB's Complaint prays that the Court determine the dischargeability of a claim of $45,000.00 against Hathaway, inclusive of attorney fees and court costs.  Hathaway filed an Answer to the Complaint on May 24, 2006.[1]

Hathaway alleges that personal use of the American Express and Visa Check cards was authorized pursuant to the corporate operating agreement, and in lieu of his collecting a salary from the company.  Hathaway alleges that the debt owed to OSB was a result of a settlement agreement which he claims was to release him from all claims by OSB, including claims of

---

[1] A Motion to Dismiss was filed by Hathaway on March 27, 2006.  A hearing was held on the matter on May 4, 2006, and the Court denied the Motion to Dismiss, which was memorialized in an Order entered May 11, 2006.

fraudulent transactions and embezzlement. Hathaway asserts several affirmative defenses to the Complaint including the equitable defenses of estoppel and unclean hands.[2] Hathaway prays that the Complaint be dismissed with prejudice and requests an award of attorney fees and costs.

Several discovery and pre-trial motions were filed in this case and litigated prior to commencing the trial.[3] Prior to trial, the parties stipulated that OSB's complaint alleges nondischargeability of debt on three grounds; the first two grounds are under § 523(a)(2) for making personal charges with two company credit cards without OSB's knowledge, consent or approval; and the third is under § 523(a)(4) for theft and embezzlement of currency without OSB's knowledge, consent or approval. Additionally, there were several pre-trial evidentiary

---

[2] The only arguments regarding affirmative defenses which Hathaway put forth at trial were that OSB had not met its burden of proof and that the Settlement Agreement reached between OSB and Hathaway constituted a novation, which precluded OSB from claiming that the Promissory Note consisted of a nondischargeable debt.

[3] The Defendant, Hathaway, filed a Motion for Summary Judgment on November 8, 2006. This motion was denied because several issues of material fact remained to be resolved. Hathaway also filed a Motion for Contempt against Steven Worrell, President of OSB, for failure to comply with a subpoena duces tecum served on September 8, 2006. Mr. Worrell represented that he believed the requested documents were irrelevant and argued that Hathaway's subpoena was an attempt to subvert the traditional discovery process. The Court denied the Motion on the grounds that Hathaway was attempting to obtain documents from Worrell personally he could not otherwise obtain from OSB through the discovery process. Hathaway filed a Motion for Contempt against Sandy Reveley, which was withdrawn prior to trial. OSB filed a Motion to Quash a Subpoena served on it on the grounds the subpoena was an attempt to subvert the traditional discovery process. The motion was denied in part and granted in part, and OSB was ordered to submit 1120S Tax Returns to Hathaway. Hathaway also moved for sanctions against OSB for failure to make disclosures under Rules 26 and 36. This motion was not timely filed and therefore denied.

objections made by both OSB and Hathaway.[4]

## II.  FINDINGS OF FACT

Steven G. Worrell ("Worrell") is President and shareholder of OSB Manufacturing, Inc. ("OSB"), a snowboard manufacturing and screen-print t-shirt company with its principal place of business in Virginia Beach, Virginia.  Tr. at 47, 121; Def. Ex. A-5, Minutes of Stockholders Meeting: August 29, 2006, dated Aug. 29, 2005.[5]  OSB was formed approximately 12 years ago and was managed by both Worrell and his former partner, David A. Barnes ("Barnes"). Tr. at 138.  During their partnership, Worrell and Barnes split the duties of the company; Worrell dealt with production, while Barnes dealt with the business affairs. Tr. at 139.   After Barnes left to pursue his surfboard career, Worrell was left as sole shareholder of the company.  Tr. at 138.  In February 2004, Worrell was introduced to William E. K. Hathaway, II ("Hathaway"), through a mutual friend. Tr. at 43.  Hathaway was looking to acquire a t-shirt company at the time. Tr. at 138.  Shortly after their initial meeting,

---

[4] Hathaway filed a Motion in Limine to exclude certain witnesses and evidence, which was resolved prior to trial.  OSB agreed not to call Laurie Worrell, wife of Steven Worrell, President of OSB, and limited their evidence to Plaintiff's exhibits numbered 8, 9, 11, 14, 51, 52, 58, 61, and 62, leaving only exhibits 8, 11, 14, 62 and 63 as contested exhibits.  The Court resolved to make a determination on the objections during trial after proper foundation for the exhibits was established.  OSB objected to the calling of Brandon Ziegler, counsel for OSB, as a witness by Hathaway, on the grounds of attorney-client privilege.  The Court overruled the objection on the grounds that certain communications, to which Mr. Ziegler could testify, might not be protected by the attorney-client privilege.  OSB also objected to the calling of two character witnesses, Chad Wilkins and Christopher McInnis, as well as several exhibits.  The also Court reserved judgment on these witness objections until proper foundation could be laid at trial.

[5] Counsel for both parties stipulated at trial that Defense Exhibit A-5 was mislabeled and the Meeting Minutes in fact were dated August 29, 2005.

Hathaway and Worrell entered into discussions regarding Hathaway acquiring part of the business.  Tr. at 138.

On May 14, 2004, Worrell and Hathaway executed a Shareholder's Agreement, which stated that in exchange for a transfer of $55,000.00 to Worrell, Hathaway would acquire half of the stock in OSB, making him a co-owner and officer of the company.[6]  The Shareholder's Agreement provided generally for compensation of the company Managers.[7]   No specific dollar amount was stated in the Shareholder's Agreement; however, Hathaway received a bi-weekly gross salary of $1,300.00 shortly after becoming a participant in the company.  Tr. at 49, 52.  Powers of the Managers were governed under the Shareholder's Agreement.  Each Manager was generally authorized to make decisions on behalf of the corporation regarding transactions in the ordinary course of business; however, the approval of both Hathaway and Worrell was required when making decisions outside of the ordinary course of business.  Tr.

---

[6] According to testimony, Steven Worrell was President and Secretary of OSB, while Hathaway was Vice President and Treasurer.  This conflicts with corporate documents which were submitted through evidence, naming Steven Worrell as President, Secretary and Treasurer.  *See* Def. Ex. A-5, Minutes of Stockholders Meeting: August 29, 2006, dated Aug. 29, 2005.  A third shareholder, Joseph Meuse, acquired 25 percent of the company from Hathaway, and remains a shareholder to date.  However, Meuse has never been an active officer in the company.  Tr. at 121, 142.

[7] Specifically, Article V of the Shareholder's Agreement stated,
MANAGEMENT FEE.  Any Manager rendering services to the Company shall be entitled to compensation commensurate with the value of such services, upon approval of the Shareholder(s) representing a majority of the interest in the Company.  REIMBURSEMENT.  The Company shall reimburse the Managers or Shareholders for all direct out-of-pocket expenses incurred by them in managing the Company.

*See* Pl. Ex. 9, Shareholder Agreement, dated May 14, 2004, page 4.

5

at 60-61; Pl. Ex. 9, Shareholder Agreement, dated May 14, 2004, page 3.

Prior to Hathaway entering the company in 2004, OSB had demonstrated consistent losses, but such losses had gradually decreased, prompting Hathaway to invest in the company. Tr. at 49. When Hathaway became a shareholder and manager of OSB, he concentrated his efforts in marketing and sales. Much like the prior arrangement between Worrell and Barnes, Worrell concentrated his efforts on production, and relied on Hathaway to manage the business, taking care of "the office, the books, the phone, mailing, billing." Tr. at 128. Prior to Hathaway's arrival, Worrell had maintained records by hand, and both his payroll and tax preparation were handled by outside agencies. Tr. at 129. Worrell only used a computer to provide printed invoices for customers, using a 2003 version of Quickbooks®. Tr. at 128. After Hathaway became a manager, the payroll service was discontinued in order to be managed internally, and Hathaway maintained records through Quickbooks® 2004, software which he purchased with OSB funds. Tr. at 129. Hathaway was also responsible for opening an American Express Corporate Credit Card Account, with a credit line of $5,000.00, shortly after joining the company. Tr. at 123. Two credit cards, one for each Worrell and Hathaway, were issued with Worrell's caveat that the cards were to be used for "emergency purposes." Tr. at 123, 168-69. Additionally, Hathaway arranged for the issuance of Visa check cards, which were to be drawn on the SouthTrust Corporate Bank Account for OSB. Tr. at 124. These check cards, according to Worrell, were supposed to be used for business trips or in case of emergency. Tr. at 124, 168-69. Worrell testified that he never used either his American Express or the Visa check card. Tr. at 123-24, 149-50. Worrell did not review

either the American Express or the SouthTrust Bank statements, besides occasionally leafing through the check ledger, leaving that portion of the business to be settled and maintained by Hathaway, while Worrell spent a majority of his time on the production floor.  Tr. at 151-53. Despite the credit and check cards, most business was conducted through company checks, which generally required signatures of both Hathaway and Worrell.[8]  Tr. at 131.  However, as illustrated by the SouthTrust bank statements submitted to the Court, once Hathaway became a Manager, several transactions were made through other means.  Pl. Ex. 58, Bank Statements from SouthTrust Bank, Small Business Checking, dated Jan. 31, 2004 to May 31, 2005.  After examining the SouthTrust bank statements, it appears that a separate category of transactions is listed for online transactions.[9]  While tangible checks remained the most common method of payment for OSB, there was a significant rise in online transactions, as illustrated in Exhibit 58, the SouthTrust bank statements.

At this point, the testimony of the events and understandings which transpired following Hathaway's entrance into the company is divergent.  According to Hathaway, aside from corporate documents, there was never any formal understanding regarding what charges

---

[8] "And everything had to be checks, which we had checks and balances in place to where every check had to have two signatures . . . everything had to be reported to each other."  Tr. at 147-48.

[9] While the category on the statement is labeled, "other withdrawals/payments," the Court notes that several eBay transactions are listed in these statements.  In addition, there are no tangible checks drawn against OSB to pay for the American Express credit card.  Instead, the American Express card appears to have been paid online.  American Express card payments are listed under "other withdrawals/payments," and are listed as "elec remit" which this Court presumes to be the abbreviation for "electronic remittance."  Pl. Ex. 58, Bank Statements from SouthTrust Bank, Small Business Checking, dated Nov. 30, 2004, pg. 3 of 12.

could be placed on the corporate credit and debit cards.  Tr. at 53.  His interpretation of the

Shareholder's Agreement was that he was "authorized to use the money as [he] saw fit." Tr.

at 59.  There was no expense ledger maintained to track the various credit card transactions.

Tr. at 56.  Instead, all transactions were "openly discussed" between Hathaway and Worrell.

Tr. at 58.  Hathaway testified that roughly two months after he became a shareholder, he was

informed that OSB would not be able to sustain his bi-weekly salary, and so his salary was

suspended.  Tr. at 53. According to Hathaway, because the business was in "chaos," the

managers could deem "normal course of business" to be whatever was necessary.  Tr. at 62.

Therefore, to offset his lack of salary he was authorized to use both the American Express

card and Visa Check Card to make personal charges, an arrangement which Hathaway

testified was once again "openly discussed" with Worrell. Tr. at 62.

According to the American Express credit card statements submitted to the Court, a

majority of the transactions were made to restaurants and hotels, among other things.[10]  Tr.

at 55.   While Hathaway did admit to using the American Express card for personal

transactions, he was unable to distinguish which transactions were made for business or

personal use when presented with a copy of the credit card statements. Tr. at 56.  Additionally,

Hathaway testified that from time to time, he had used his Visa check card for personal

transactions, including cash withdrawals.  Tr. at 59.   Hathaway testified that his cash

---

[10] In addition to restaurant and hotel charges, there were charges made to gas stations and
supermarkets, and one transaction with the Armani Exchange in Washington, D.C., which
totaled over $300.00.  Pl. Ex. 61, American Express Statements, dated Dec. 13, 2004, pg. 4 of
12.

withdrawals were for both business and personal uses.  Tr. at 89.  On occasion, he would

withdraw more than what was owed to pay certain vendors, keeping the remainder for himself

"as an emergency."  Tr. at 89.  Hathaway stated there was no formal agreement between

himself and Worrell, authorizing the use of the Visa check card; however, the arrangements

and authorization for Hathaway's personal use of the card had been "openly discussed" with

Worrell. Tr. at 59, 62. As with the American Express statements, Hathaway was unable to

distinguish between personal and business transactions on the SouthTrust bank statements.

Tr. at 77.

Both the American Express and SouthTrust bank statements were addressed and

mailed to Worrell.  Tr. at 95. As was the case with all other business conducted at OSB,

Hathaway testified that the contents of the bank statements were "openly discussed" between

the two Managers and the financial condition of the company was assessed on a daily basis.

Tr. at 96. Hathaway stated that he never made any attempt to conceal his personal use of  the

corporate funds.  Tr. at 96.  All of the book-keeping and financial documents were kept in the

office where both Managers could review them.  Tr. at 98.  Furthermore, Hathaway testified

that there were specific discussions where he was given direct permission from Worrell to use

corporate funds for personal expenses to offset his lack of salary.  Tr. at 100.

Hathaway testified that he was specifically authorized to pay his personal rent using

corporate funds, an arrangement which he had once again "openly discussed" with Worrell.

Tr. at 63, 99. From the exhibits submitted at trial, six separate handwritten checks were drawn

against OSB's SouthTrust bank account and payable to Kelly DeForest, Hathaway's

landlord.[11] Hathaway testified that four of these checks (checks numbered 2058, 2000, 1969,

2047) were drawn for the specific purpose of paying his personal rent and utilities.  Tr. at 65,

69, 70-71.  However, the check ledger for three of these checks (1969, 2000, and 2058)

reflected check stubs which stated "void" or "void, lost," or "void, misprint," instead of

"Rent" or another similar identifier. Pl. Ex. 62, Check stubs from Wachovia Bank Business

Account, dated Jan. 31, 2004 to May 31, 2005.  Hathaway testified that he was not sure

whether the writing on the check stubs for checks numbered 2000 and 2058 was his

handwriting; however he testified that the writing on the check stub for check number 1969

was indeed his handwriting.[12]  See Pl. Ex. 62, Check stubs from Wachovia Bank Business

Account, dated Jan. 31, 2004 to May 31, 2005.  On check number 2047, a check made

payable to Kelly DeForest for $734.00, however, the original stub appears to have been made

out to        "ACC" for $366.28.  *Compare* Pl. Ex. 58, Bank Statements from SouthTrust

Bank, Small Business Checking, dated Jan. 31, 2005, pg. 7 of 9, *with* Pl. Ex. 62, Check stubs

from Wachovia Bank Business Account, dated Jan. 11, 2005, pg. 2 of 2.  The stub had the

---

[11] The Court noted two checks written to Kelly DeForest which were not brought up during testimony, but were submitted in Plaintiff's Exhibit Number 58, Bank Statements from SouthTrust Bank, Small Business Checking.  Check Number 2235 was written for $780.00 on March 8, 2005.  Check Number 2141 was written on April 9, 2005 for $770.00.  Both checks were signed only by Hathaway.

[12] With regard to the check stub for check number 2058, when asked whether "Void, misprint" was written in his handwriting, Hathaway responded, "I can't tell."  Tr. at 66.  With regard to the check stub for check number 2000, when asked whether "Void, lost" was written in his handwriting, Hathaway responded, "No, not that I can tell."  Tr. at 70.  With regard to the check stub for check number 1969, when asked whether "Void" was written in his handwriting, Hathaway responded, "That is correct."  Tr. at 70.

word "void" written across it, and Hathaway testified that this was not his handwriting.  Tr. at 72.

Worrell's understanding of the events which transpired following Hathaway's entry into the business are vastly at odds with Hathaway's testimony.  According to Worrell, after Hathaway entered the business, Worrell continued to collect a salary until December 2004, and after that point, chose to live off of his home equity line of credit until the business could once again sustain salaries for the Managers. Tr.  at 131-32.  Worrell testified that Hathaway received a paycheck for roughly six months before Hathaway *voluntarily* stopped taking a salary.  Tr. at 166. According to exhibits submitted at trial, it appears that Hathaway indeed received a salary until at least the end of September,[13] which contradicts Hathaway's testimony that he received a salary for "two-and-a-half" or "two to three months" after becoming a Manager.  Tr. at 52-53; Pl. Ex. 58, Bank Statements from SouthTrust Bank, Small Business Checking, dated Oct. 31, 2004, page 7 of 11.  Worrell stated that he had never authorized Hathaway to use the American Express or Visa check cards for personal expenses, nor had Hathaway's use of the cards for personal expenses ever been discussed, openly or otherwise.  Tr. at 125, 132.  Furthermore, it was not OSB's policy to entertain customers or clients, and Worrell stated that the restaurant and hotel transactions made by Hathaway were not legitimate business activities. Tr. at 125. While Hathaway was unable to distinguish

---

[13] Check number 1934 purports to be a check written for $1,012.55 and payable to William E.K. Hathaway for "Pay Period: 09/10/2004-09/23/2004."  Pl. Ex. 58, Bank Statements from SouthTrust Bank, Small Business Checking, dated Oct. 31, 2004, page 7 of 11.

between business and personal charges on the credit card statement, Worrell testified that

there was $11,258.62 in non-business expenses charged to the American Express card. Tr.

at 128. Additionally, Worrell testified that Hathaway had charged $23,149.35 in personal

expenses against the SouthTrust bank account. Tr. at 127.[14]

Despite Hathaway's claims that these expenses were "openly discussed," Worrell

testified that none of the charges had been brought to him for approval. Tr. at 128. Worrell

stated that he never saw the American Express statements or SouthTrust Bank statements. Tr.

at 130. Instead, Worrell wanted a business partner he could trust to take care of the office,

so that he could spend more time on the production floor. Tr. at 140. He had trusted

Hathaway to manage the business without any help or oversight. Tr. at 140. Worrell's

involvement in the business management of OSB was limited to occasionally flipping through

the check ledger. Tr. at 140. Otherwise, he "didn't check the bank statements and [didn't]

check the credit card statements." Tr. at 152. Despite the fact that both men were in the office

daily, Hathaway checked the mail every day, and arranged for many of OSB's transactions

---

[14] Worrell testified that he calculated these amounts by tabulating all transactions which he believed were personal expenses. Business expenses and those transactions which might be construed as business expenses were not included in his tally. Tr. at 149. In determining whether a transaction was business or personal, Worrell testified he included expenses that were "obviously personal." Tr. at 150. "Three dollars for an egg and water at 7-Eleven isn't business, so that obviously was personal. . . . Most of the places that charges were made to are obviously not business, whether it be LunaSea's, Rockafeller's, or I mean, Rudy's, Chicho's, those things are obviously not business. Anything that was deemed possible for business was not included." Tr. at 150. With regard to Hathaway's purchase at the Armani Exchange, Worrell stated "I mean, Armani's for Men definitely isn't one of our clients, and an $800 business suit does not fall under the guise of building snowboards or making T-shirts so obviously that was a personal expense." Tr. at 151.

to be made online, which he would facilitate through his own personal laptop computer.  Tr.

at 130.  When a check required Worrell's signature, Hathaway would present Worrell with

a prepared check "already filled out and signed" while Worrell was on the production floor.

Tr. at 131. Worrell also testified that Hathaway had never discussed paying his personal rent

with OSB funds, nor did Worrell ever authorize Hathaway to so do.  Tr. at 132.

On May 15, 2005, the dispute over Hathaway's personal use of OSB corporate cards

and accounts came to a head.  Hathaway wrote out by hand and signed two promissory notes

("handwritten Notes") purporting to waive any claims against OSB and agreeing to repay

OSB $25,000.00 by July 15, 2005.  Tr. at 81; Pl. Ex. 51, Statements signed by Kyle Hathaway

for promises to pay amounts owed to OSB, dated May 17, 2005.  The handwritten Notes also

purported that $22,370.00 had been paid by Hathaway to the company as reimbursement for

personal expenses incurred on Hathaway's behalf.   Tr. at 82; Pl. Ex. 51, Statements signed

by Kyle Hathaway for promises to pay amounts owed to OSB, dated May 17, 2005.  Finally,

the handwritten Notes stated that Hathaway agreed to pay an additional $15,000.00 by

October 31, 2005 for debt charged to the American Express credit card.  Pl. Ex. 51,

Statements signed by Kyle Hathaway for promises to pay amounts owed to OSB, dated May

17, 2005.  Hathaway admitted that the purpose of this transaction was to reimburse OSB for

personal use of corporate funds, totaling $40,000.00.[15]  Tr. at 84. Worrell, however, testified

---

[15] Plaintiff also introduced an exhibit which purported to be copies of stock certificates
which Hathaway presented to Worrell at the time they were negotiating the terms of the
Promissory Note to demonstrate his ability to repay.  Hathaway testified that since the signing of
the Promissory Note, the stock is essentially worthless. Tr. at 86-89; Pl. Ex. 11, Stock Certificate
for Wireless Frontier Internet, Inc., dated Jan. 14, 2004 and Mar. 31, 2004.

that Hathaway was reimbursing the company for fraudulent misuse of the corporate cards, not

merely personal use. Tr. at 134, 161. Hathaway stated that the amounts he agreed to pay

were not the result of any specific tallying of disputed expenses. Tr. at 105. Instead, the

dollar amounts were generated by Laurie Worrell, Worrell's wife, who had refused to

negotiate with Hathaway. Tr. at 106.

The handwritten Notes were later memorialized in a single Promissory Note dated

August 29, 2005 ("Promissory Note"). Tr. at 83; Pl. Ex. 52, Promissory Note, dated Aug. 29,

2005. When Hathaway originally signed the handwritten Notes in May of 2005, he testified

that he had the intention of trying to salvage and retain his investment in the company. Tr.

at 115. However, by August 2005 he had changed his mind and decided to separate from the

company. Following the execution of the Promissory Note on August 29, 2005, Hathaway

testified that he reached a settlement with OSB. Tr. at 108. He believed that in exchange for

forgiving the money he had invested in the company and his unpaid salary, return of his stock,

and execution of the Promissory Note, he would be fully released from any claims made by

OSB against him. Tr. at 108. This settlement, Hathaway claimed, was memorialized in the

Shareholder's Meeting Minutes ("Meeting Minutes"), dated August 29, 2005. Tr. at 107; Def.

Ex. A-5, Minutes of Stockholders Meeting: August 29, 2006, dated Aug. 29, 2005. The

Meeting Minutes purport to release Hathaway from "any claims from his use of the American

Express card and use of a debit card on SouthTrust, both from April of 2004 through May

2005. No other claims are released." Def. Ex. A-5, Minutes of Stockholders Meeting: August

29, 2006, dated Aug. 29, 2005. The release, Hathaway believed, was effective upon his

14

signing of the Promissory Note, and released him from all disputes between himself and OSB. Tr. at 112.

Worrell, however, did not believe this was the arrangement which he had made with Hathaway. Worrell's understanding was that Hathaway would pay on the Promissory Note, and then he would be released.[16] Tr. at 134. The Meeting Minutes, on which Hathaway relies, were not the result of an actual Shareholder's Meeting, but a meeting which took place between Brandon Ziegler, the Worrells' (not OSB's) attorney, and Laurie Worrell, who was not an officer or shareholder in the company. Tr. at 136. No written release was ever prepared for Hathaway's execution, instead, Worrell intended to release Hathaway *after* he had paid the Promissory Note in full. Tr. at 137. According to Worrell, "[t]here's never been a release." Tr. at 165.

### III. CONCLUSIONS OF LAW

The facts of this case present this Court with three legal issues. First, whether the actions of the Debtor, Hathaway, satisfy the requirements for fraud under Section 523(a)(2)(A) exception to discharge. Second, whether the actions of the Debtor, Mr. Hathaway, constituted embezzlement under Section 523(a)(4), exception to discharge. Finally, even if these underlying actions satisfy the exceptions to discharge under Section 523, whether the Settlement Agreement, as memorialized in the meeting minutes, between Hathaway and OSB precludes OSB's right to recover on the claim against Hathaway.

---

[16] "[H]e was always looking for a way to pay us, and we weren't trying to entertain the not payment of it." Tr. at 134.

15

As this Court has previously noted, a debtor's ability to receive a fresh start is one of the most important and powerful benefits of bankruptcy. This concept of a fresh start demands that courts construe exceptions to discharge narrowly against the objecting creditor and in favor of the debtor. *Gleason v. Thaw*, 236 U.S. 558, 561-62 (1915); *Foley & Lardner v. Biondo* (*In re Biondo*), 180 F.3d 126, 130 (4th Cir. 1999) (citing *Century 21 Balfour Real Estate v. Menna* (*In re Menna*), 16 F.3d 7, 9 (1st Cir. 1994)); *Rezin v. Barr* (*In re Barr*), 194 B.R. 1009, 1016 (Bankr. N.D. Ill. 1996) (citing *Mayer v. Spanel Int'l Ltd.*, 51 F.3d 670, 674 (7th Cir. 1995)); *see also Elrod v. Bowden,* (*In re Bowden*), 326 B.R. 62, 81 (Bankr. E.D. Va. 2005); *KMK Factoring, L.L.C. v. McKnew* (*In re McKnew*), 270 B.R. 593, 617 (Bankr. E.D. Va. 2001). Courts, however, must strike a balance between protecting a debtor's fresh start and the principle that "perpetrators of fraud are not allowed to hide behind the skirts of the Bankruptcy Code." *In re Biondo,* 180 F.3d at 130 (citing *Cohen v. Cruz*, 523 U.S. 213, 217 (1998)). The exceptions at issue in this case arise under § 523, which makes debts non-dischargeable:

> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by –
>> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition: . . .
> (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

11 U.S.C. §§ 523(a)(2)(A), (a)(4) (2006). Under Federal Rule of Bankruptcy Procedure 4005, the plaintiff has the burden to prove that a debt is non-dischargeable. Under § 523(a), the plaintiff must prove non-dischargeability by a preponderance of the evidence. *Grogan*

16

*v. Garner*, 498 U.S. 279, 291 (1991); *Farouki v. Emirates Bank Int'l, Ltd.,* 14 F.3d 244, 249

(4th Cir. 1994); *Combs v. Richardson*, 838 F.2d 112 (4th Cir. 1988); *Whitson v. Middleton*

(*In re Middleton*), 100 B.R. 814, 818 (Bankr. E.D. Va. 1988).  Therefore, OSB must prove

by a preponderance of the evidence whether these provisions of § 523 apply to the case at

issue.

    A.  § 523(a)(2)(A) False Pretenses, False Representation Or Actual Fraud

    As this Court and others have previously held, to make a debt non-dischargeable

under § 523(a)(2)(A), the plaintiff must prove the following elements:

> (1) That the debtor made a representation;
> (2) That at the time the representation was made, the debtor knew the representation was false;
> (3) That the debtor made the false representation with the intention of deceiving the creditor;
> (4) That the creditor relied on such representation; and
> (5) That the creditor sustained the alleged loss and damage as the proximate result of the false representation.

*Fowler v. Garey* (*In re Garey*), 258 B.R. 356, 360-61 (Bankr. E.D. Va. 2000); *Parker v.*

*Grant* (*In re Grant*), 237 B.R. 97, 112 (Bankr. E.D. Va. 1999); *Spinoso v. Heilman* (*In re*

*Heilman*), 241 B.R. 137, 149 (Bankr. D. Md. 1999); *Hecht's v. Valdes* (*In re Valdes*), 188

B.R. 533, 535 (Bankr. D. Md. 1995); *Clarkson v. Elibuyuk* (*In re Elibuyuk*), 163 B.R. 75, 76

(Bankr. E.D. Va. 1993).[17]  "A plain reading of this subsection [523(a)(2)(A)] demonstrates

---

[17] As these cases and, most recently, *Foley & Lardner v. Biondo* (*In re Biondo*), 180 F.3d 126, 130 (4th Cir. 1999), demonstrates, the Fourth Circuit analyzes § 523(a)(2)(A) by strictly focusing on misrepresentations.  While the Seventh Circuit Court of Appeals and the Sixth Circuit Bankruptcy Appellate Panel adopt a broader definition of § 523(a)(2)(A), such definition includes general tricks and deceit rather than only misrepresentations.  *See McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000); *Mellon Bank, N.A. v. Vitanovich* (*In re Vitanovich*),

that Congress excepted from discharge not simply any debt incurred as a result of fraud but only debts in which the debtor used fraudulent means to obtain money, property, services, or credit." *Nunnery v. Rountree* (*In re Rountree*), ___ F.3d ___, 2007 WL 586568 at *2 (4th Cir. 2007).  Accordingly, the Court must analyze whether these requirements have been met in the instant manner.

### 1.  Did Hathaway Make a Representation?

Representations are either express or implied.  "A false representation is an express misrepresentation, while a false pretense refers to an implied misrepresentation of 'conduct intended to create and foster a false impression.'"  *Nat'l Bank of N. Am. v. Newmark* (*In re Newmark*), 20 B.R. 842, 854 (Bankr. E.D.N.Y. 1982) (quoting *H. C. Prange Co. v. Schnore* (*In re Schnore*), 13 B.R. 249, 251 (Bankr. W.D. Wis. 1981)).  As this Court held in *Parker v. Grant* (*In re Grant*), 237 B.R. 97, 113 (Bankr. E.D. Va. 1999), and *Household Finance Corp. v. Kahler* (*In re Kahler*), 187 B.R. 508, 512 (Bankr. E.D. Va. 1995), § 523(a)(2)(A) does not require any overt misrepresentation; this Court may imply such a misrepresentation from the debtor's silence.

This Court has previously held that a misrepresentation occurs when funds are entrusted to a debtor for a specific purpose, and the debtor has no intention of using the money for that purpose.  *Elrod v. Bowden* (*In re Bowden*), 326 B.R. 62, 83 (Bankr. E.D. Va. 2005); *KMK Factoring, L.L.C.* (*In re McKnew*), 270 B.R. 593, 619 (Bankr. E.D. Va. 2001)

---

259 B.R. 873, 877 (B.A.P. 6th Cir. 2001).

(citing *Marineau v. Slonim*, No. Civ. A. 94-047, 1994 WL 661143, at *2 (W.D. Va. Nov. 10, 1994); *Fensick v. Segala* (*In re Segala*), 133 B.R. 261, 264 (Bankr. D. Mass. 1991) ("If funds are deemed to have been entrusted to the debtor for a specific purpose, the debtor is regarded as impliedly representing his intention to use the funds accordingly."); *Miller v. Blagaich* (*In re Blagaich*), 67 B.R. 375, 377 (Bankr. S.D. Fla. 1986); *see also City Nat'l Bank of Fla. v. Sheridan* (*In re Sheridan*), 57 F.3d 627, 635 (7th Cir. 1995); *Leverage Leasing Corp. v. Reitz* (*In re Reitz*), 69 B.R. 192, 196 (N.D. Ill. 1986).  Furthermore, "[f]raud and misrepresentation may be established by a failure to disclose on the part of the debtor where such failure creates a false impression which is known by the debtor."  *Caldwell v. Hanes* (*In re Hanes*), 214 B.R. 786, 809 (Bankr. E.D. Va. 1997) (citing *O'Connor, CPO v. Booker* (*In re Booker*), 165 B.R. 164 (Bankr. M.D.N.C. 1994)).

The testimony in this case is divergent on whether the corporate credit cards were authorized for use by Hathaway for personal transactions.  According to Hathaway, he was authorized to use the cards for his personal expenses in order to offset his lack of salary.  In contrast, Worrell, who was also without salary, stated that the cards were to be used for emergency purposes or business travel.  Additionally, the Shareholder's Agreement specifically states that all matters outside of the ordinary course of business must be approved by both Managers.  Hathaway has maintained, however, that all matters, including his personal use of the credit cards, were "openly discussed" with Worrell, and he made no attempts to conceal his actions.  Worrell, on the other hand, denies that any conversations ever took place, and that Hathaway's actions were in violation of the authorized uses for the

19

cards, and such transactions were made without his knowledge or consent.  Worrell states that Hathaway never disclosed his personal use of the cards, thus, he claims that Hathaway committed a misrepresentation by using the cards for personal transactions in violation of their authorized uses.

The Court finds Worrell's testimony that Hathaway used the credit cards in violation of their authorized use to be the more credible testimony.  OSB did not have corporate credit cards prior to Hathaway's arrival.  Once Hathaway became a Manager, he opened both credit card accounts. Hathaway was the only Manager who used the cards, Worrell testified that he never used either the American Express or the Visa check card, but instead stored both cards in his desk drawer.  The Court finds it troublesome that both Worrell and Hathaway would stop taking salary, yet Hathaway would be allowed to offset his salary by using corporate credit cards, while Worrell was living off of his home equity line of credit. Additionally, when questioned, Hathaway could not distinguish between which credit card transactions were personal and which were business, however he maintained that all transactions were "openly discussed" with Worrell.  The Court finds it inherently suspect that Hathaway, after discussing his transactions with Worrell, would be unable to distinguish or recall specific personal transactions, or even recall with any specificity, discussions which he had with Worrell regarding such transactions.  Furthermore, Hathaway was solely responsible for managing the financial affairs of the company.  Worrell testified that while he occasionally "leafed through" the checkbooks, he relied on Hathaway to maintain records and conduct third party transactions.  The only consistent oversight task executed by Worrell was his

20

requirement that both he and Hathaway sign company checks.

Hathaway's testimony on the other hand lacks credibility for a number of reasons. First, his testimony directly conflicts with other evidence in the record. Hathaway testified that he only received a salary for roughly two months; however, bank statements submitted into evidence demonstrate that he was receiving a salary through at least the end of September 2004. Second, Hathaway's responses were vague at best when he was directly asked questions concerning credit card authorization, discussions he had with Worrell, and when asked to distinguish between business or personal transactions. At times, it appeared that his only answer throughout his entire examination was that he had "openly discussed" the matters with Worrell. Worrell, on the other hand, could not recall *any* discussion regarding personal use of the credit cards.

However, the most compelling evidence weighing against Hathaway's credibility was his responses during direct testimony regarding the corporate checks written to cover Hathaway's personal rent. Hathaway's testimony was inconsistent throughout this part of the examination. Sometimes he admitted to writing check stubs, while at other times he claimed he was unable to even identify the handwriting on a particular check stub. The Court finds this particularly disturbing, as one of the few consistent and unchallenged facts was that Hathaway maintained almost complete control over OSB's financial records. For the foregoing reasons, this Court believes that Worrell, rather than Hathaway, provides the more accurate recounting of the events surrounding this case. Thus, this Court believes that Hathaway, knowing the restrictions placed on the cards, used the cards for personal use in

violation of their authorized uses, and did so without the knowledge of Worrell or permission of OSB.   Hathaway did not disclose his personal use of cards, and instead continued to conduct the business of OSB without informing Worrell of his unauthorized use of the cards, causing Worrell to falsely believe that neither he nor Hathaway were using the credit cards for other than business purposes.   Hathaway, then, entrusted with company funds, and without disclosing his personal use of the cards to Worrell, committed a misrepresentation. Finally, there is no corroborative evidence provided by Hathaway for this Court to believe otherwise.   While Hathaway was candid during his testimony regarding his personal use of the cards, the Court finds that Hathaway made a misrepresentation to Worrell by using the cards for personal expenses, without disclosing this use to Worrell, knowing they were authorized only for emergency use and business expenses.

### 2.  Did Hathaway Know the Representation was False?

For a debt to be nondischargeable, the plaintiff must prove the debtor knew or should have known that the representation was false when made.   *KMK Factoring, L.L.C. v. McKnew* (*In re McKnew*), 270 B.R. 593, 619 (Bankr. E.D. Va. 2001);  *Parker v. Grant* (*In re Grant*), 237 B.R. 97, 115 (Bankr. E.D. Va. 1999) (citing *Berk v. Stewart* (*In re Stewart*), 10 B.R. 214, 217 (Bankr. C.D. Cal. 1981); *Koma v. Brooks* (*In re Brooks*), 4 B.R. 237, 238 (Bankr. S.D. Fla. 1980)).

It follows from the above analysis that, because Hathaway knowingly used the cards in violation of their authorized purposes, that Hathaway knew he was using the cards fraudulently and without consent of OSB.   Based on the Court's earlier factual

22

determinations, this Court finds that at the time that Hathaway was using the cards for

personal transactions, he knew he was doing so without permission or authorization from

OSB.  Hathaway knew that Worrell was unaware of his actions, because Hathaway was

responsible for all of OSB's financial records.  Hathaway was thus able to continue to charge

items to OSB without arousing suspicion from Worrell.  There is no evidence in the record,

other than Hathaway's insistence that he "openly discussed" his use of the cards with

Worrell, to indicate that Hathaway believed his use of the cards to be appropriate or

expressly authorized.   Therefore, the Court concludes that the second element of

nondischargeability under Section 523(a)(2)(A) is satisfied.

### 3.  Did Hathaway Intend to Deceive?

"Because direct proof of intent (i.e., the debtor's state of mind) is nearly impossible

to obtain, the creditor may present evidence of the surrounding circumstances from which

intent may be inferred."  *Universal Bank, N.A. v. Grause* (*In re Grause*), 245 B.R. 95, 99

(B.A.P. 8th Cir. 2000) (quoting *Caspers v. Van Horne* (*In re Van Horne*), 823 F.2d 1285,

1287 (8th Cir. 1987)); *see also Marunaka Dainichi Co. v. Yamada* (*In re Yamada*), 197 B.R.

37, 40 (Bankr. E.D. Va. 1996); *Western Union Corp. v. Ketaner* (*In re Ketaner*), 154 B.R.

459, 465 (Bankr. E.D. Va. 1992).  "An intent to deceive may be inferred from a false

representation which the debtor should have known would induce a creditor."  *Parker v.

Grant* (*In re Grant*), 237 B.R. 97, 115 (Bankr. E.D. Va. 1999) (quoting *Bebber v. J.M.

Westall & Co.* (*In re Bebber*), 192 B.R. 120, 124 (Bankr. M.D.N.C. 1995)).  This Court has

held if the "'debtor recklessly makes false representations that he should know will induce

another to rely thereon, intent to deceive may be inferred for purposes of § 523(a)(2)(A).'"
*In re Grant*, 237 B.R. at 115 (citing *Household Fin. Corp. v. Kahler* (*In re Kahler*), 187 B.R.
508, 513 (Bankr. E.D. Va. 1995)).  The recklessness "'must exceed negligence and rise to
the level of reckless disregard for the truth.'"  *Id.* (quoting *In re Kahler*, 187 B.R. at 513).
Further, "intent to defraud must exist at the time the debtor made the representations; any
subsequent conduct that is contrary to the original representation does not necessarily
indicate that the original representation was false." *Id.* (citing *Mann v. Boese* (*In re Boese*),
8 B.R. 660, 662 (Bankr. D.S.D. 1981)).  Finally, once a creditor has provided circumstantial
evidence giving rise to this intent, a debtor cannot overcome the inference by making
unsupported assertions of honest intent.  *In re Yamada*, 197 B.R. at 40; *In re Ketaner*, 154
B.R. at 465.

The Court finds that OSB has sustained its burden of proof as to Hathaway's intent
to deceive.  Hathaway was well aware that Worrell was relying on him to maintain all
financial records.  Worrell had treated his former partner, Barnes, in the same manner in
which he treated Hathaway; he trusted him to take care of all management aspects of the
business.  Hathaway knew Worrell was trusting him to manage OSB's financial affairs
without his assistance or supervision.  Furthermore, Hathaway also increased his personal
control over OSB's finances.  He checked the mail daily, made online payments from his
laptop computer, and installed Quickbooks® software, rendering him almost complete control
over OSB's finances.  Thus it can be inferred that Hathaway knew Worrell would not
discover Hathaway's financial indiscretions unless Hathaway specifically brought the

charges on the cards to Worrell's attention.

While the Court is mindful that Hathaway has repeatedly testified that he made no attempts to specifically conceal his actions from Worrell, the Court does not believe in the credibility of Hathaway's testimony.  Given the surrounding circumstances, Hathaway did not need to actively conceal his actions from Worrell; in effect, he was hiding in plain view by relying on Worrell's trusting nature. He knew that Worrell would not actively supervise his actions, nor would he review the credit card or bank statements. Therefore, the Court concludes that Hathaway possessed the requisite intent to deceive Worrell by using the corporate credit cards for personal use without Worrell's knowledge or permission, and the third element of Section 523(a)(2)(A) is satisfied.

### 4.  Did OSB and the Worrells Justifiably Rely on the Representations?

The fourth element of fraud requires that OSB and Worrell prove that he relied on Hathaway's representations.  The Supreme Court has held that a plaintiff must prove that he justifiably relied on the debtor's representations in order to succeed under Section 523(a)(2)(A). *Field v. Mans*, 516 U.S. 59, 73-74 (1995).  Under this standard, "[j]ustification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." *Id*. at 71.[18] In several common-law states adopting this standard, it is interpreted

_____

[18]  The justifiable reliance standard, in which the focus is on whether the falsity of the representation should have been "readily apparent" to the person to whom it was made, can be contrasted with the more stringent standard of reasonable reliance, which focuses on whether the reliance was reasonable under the "hypothetical average person" standard. *Field*, 516 U.S. at 71-75; *In re Grant*, 237 B.R. at 116 n.32 (citing 4 Collier on Bankruptcy ¶ 523.08[1][d] (15th ed.));

as imposing no duty to investigate, absent factors arousing suspicion.  *Parker v. Grant* (*In re Grant*), 237 B.R. 97, 116 (Bankr. E.D. Va. 1999) (citing *Field*, 516 U.S. at 73 n.12; *Franklin v. Nunnelley*, 242 Ala. 87, 89, 5 So.2d 99, 101 (1941)).  For example, "[a] buyer's reliance on this factual representation [seller's statement the land is free of encumbrances] is justifiable, even if he could have 'walked across the street to the office of the register of deeds in the courthouse' and easily have learned of an unsatisfied mortgage."  *Field*, 516 U.S. at 70 (quoting Restatement (Second) of Torts § 540 (1976) (Illustration 1)).

This definition of reliance is not without limits, however.  As this Court has previously held, "a creditor 'cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation.'" *In re Grant*, 237 B.R. at 116 (citing *Field*, 516 U.S. at 70). Thus, if one has a warning of deception, one needs to investigate on his own.  *Id.*  However, as was clearly held in *In re Biondo,* a sophisticated entity is not required to examine financial statements but can justifiably rely upon the debtor's representation.  180 F.3d at 135 (citing *Field v. Mans*, 516 U.S. 59, 70 (1995)). Plaintiffs are not required to continually look over an entity's shoulder.

This case certainly has circumstances which very closely toe the line of justifiable reliance.  Hathaway received little to no supervision or oversight, despite the fact he was a new Manager and Worrell had only known him briefly.  Worrell did not review the corporate

_____

*see also Mester v. Brevard* (*In re Brevard*), 200 B.R. 836, 845 (Bankr. E.D. Va. 1996).  The reasonable reliance standard is discussed in more detail in Section III.B.2, *infra*.

accounts, he did not read the credit card statements, and he only occasionally "leafed through" the check ledger and checkbook. However, the standard this Court must apply is not reasonable reliance, but justifiable reliance. While Worrell is not expected to supervise his fellow Manager at all times, Worrell's complete trust in his co-owner in these circumstances falls dangerously close to blind faith.

Justifiable reliance does not require that Worrell continually look over Hathaway's shoulder. In fact, to require such vigilance would defeat Worrell's goal in bringing Hathaway into the business in the first place. Instead, Worrell is merely obligated to investigate the situation once he is suspicious that there has been foul play. Because Hathaway was essentially in complete control of the business affairs of the company, Worrell was unaware that the company was continuing to suffer at the hands of Hathaway. Worrell knew that the company was losing money, however, he did not realize that much of it was leaving through the personal credit card charges of his co-Manager. The testimony and evidence here demonstrates that once Worrell became aware of Hathaway's misuse of the credit cards, he acted quickly to resolve the matter, requiring Hathaway to sign promissory notes agreeing to repay the credit card debts he had generated on behalf of OSB. Furthermore, a cursory examination of the checkbooks would not have alerted Worrell to the fact that the credit cards were being misused, as it appears the American Express card bill was not paid through paper checks.[19] To be sure, Worrell could have asked to see the credit

_____

[19] After this Court's review of the SouthTrust bank statements, it appears that tangible paper checks were not used to pay the American Express bills. Furthermore, the Visa check card

card statements, but given the fact that he had never used the cards, and both he and Hathaway had agreed the cards were only for emergency purposes, he had no reason to believe that Hathaway was using the cards, let alone that he was abusing them.  No circumstances arose that would have triggered suspicion in Worrell as to a possible misrepresentation by Hathaway until after the company had suffered severe harm at the hands of Hathaway.  Therefore the Court finds that the fourth element of fraud has been met in this case.

    5.  Did OSB's Damages Proximately Result from Hathaway's Representations?

    The final element of fraud that OSB must prove is whether damages were a proximate result of Hathaway's misrepresentations.  Proximate cause is both (1) causation in fact, "loss suffered by one who justifiably relies upon the trust of the matter misrepresented, if his reliance is a substantial factor in determining the course of conduct that results in his loss;" and (2) legal causation, "if the loss might reasonably be expected to occur from the reliance." *KMK Factoring, L.L.C. v. McKnew* (*In re McKnew*), 270 B.R. 593, 622 (Bankr. E.D. Va. 2001) (citing Restatement (Second) of Torts §§ 546, 584A (1976)); *see also Britton v. Price* (*In re Britton*), 950 F.2d 602, 604 (9th Cir. 1991);  *Parker v. Grant* (*In re Grant*), 237 B.R. 97, 117 (Bankr. E.D. Va. 1999); *Shannon v. Russell* (*In re Russell*), 203 B.R. 303, 313 (Bankr. S.D. Cal. 1996).

---

transactions were automatically debited from the account.  Thus, by merely reviewing the checkbook, Worrell would not have been alerted to the fact that the credit cards were actually being used on a regular basis by Hathaway for his personal expenses.

There is no dispute that OSB has suffered a harm in this instance. Worrell testified that OSB has lost $11,258.62 as a result of Hathaway's misuse of the American Express card. Additionally, Worrell testified that Hathaway had charged $23,149.35 in personal expenses against the SouthTrust bank account. Worrell did not differentiate between charges made to the SouthTrust bank account using the Visa check card and charges as a result of alleged embezzled funds. Therefore the Court finds that the first element of proximate cause, that of causation in fact, is clearly met in this case. Given the fact that Worrell did not differentiate the funds on the SouthTrust bank account, the Court will reserve determination of the exact amount of nondishargeable debt until after it concludes analysis regarding whether OSB suffered damages legally caused by Hathaway and following the analysis of the second count of OSB's claim.

The remaining question then, is whether OSB suffered damages that were legally caused by Worrell's reliance on Hathaway's misrepresentations. In this instance, there is a strong correlation between Hathaway's misuse of the corporate credit cards and Worrell's reliance on Hathaway to responsibly manage the business. Had Worrell known that Hathaway was using the credit cards for personal transactions, he would not have allowed Hathaway to continue to manage the business, or to deplete OSB's funds for his own personal gain. In fact, upon discovery of the misrepresentation, Worrell took action to stop Hathaway's misuse of the cards.

The instant case is unlike that of *Kaufman v. Vamvakaris* (*In re Vamvakaris*), 197 B.R. 228 (Bankr. E.D. Va. 1996), in which the Court found that the loss of the jewelry was

29

not caused by the misrepresentation by the jewelry dealer as to theft insurance coverage, but rather, the loss was caused by the theft itself. *Id.* at 231. This case also bears no similarity to *In re Grant*, wherein this Court found that the plaintiffs failed to show any causal connection between the debtor's misrepresentation of his marital status at the time of leasing a dwelling and the physical damage subsequently done to the leased condominium. *In re Grant*, 237 B.R. at 118-19.

Instead, causation in the instant case is more similar to *In re McKnew*, where this Court held that the debtor removed funds from the plaintiff business and converted the funds for his own personal use and other uses upon a misrepresentation to his business associates as to the amount of salary he was drawing from the business as its manager. *In re McKnew*, 270 B.R. at 618-19, 622. In the latter case, the Court found a direct correlation between the damages (the loss of funds) and the misrepresentation by the debtor. *Id.* at 622. *In re Bowden*, a recent case decided by this Court, also bears similarities to the instant case. *Elrod v. Bowden* (*In re Bowden*), 326 B.R. 62 (Bankr. E.D. Va. 2005). This Court held that the debtor obtained a loan from the plaintiff for his own personal use through a misrepresentation to the plaintiff of the purpose of the loan and the subsequent loss of money suffered by the plaintiff. *Id.* at 89. The Debtor's misrepresentation to the plaintiff and the plaintiff's justifiable reliance thereon caused the plaintiff to lend the debtor a considerable sum of money that the plaintiff would not have lent, had he known the true purpose of the loan. *Id.* In the instant case, too, this direct correlation between the misrepresentation of the debtor and the damages suffered by the plaintiff exists. In other words, but for the misrepresentation by

30

Hathaway (unauthorized personal use of corporate credit cards), OSB would not have suffered a loss.

Having satisfied each of the elements required under Section 523(a)(2)(A) of the Bankruptcy Code, the indebtedness to OSB is declared nondischargeable.

### B.  § 523(a)(4) Embezzlement and Larceny

OSB also seeks to recover the monies removed by Hathaway from the SouthTrust bank account, in the form of checks drawn against OSB for Hathaway's personal rent checks, alleging that § 523(a)(4) prohibits discharge of this indebtedness.  Specifically, OSB alleges that as an employee of the company, Hathaway, knowingly and willfully stole and embezzled the money with the intention to permanently deprive OSB without permission or approval of OSB.[20]  Compl. ¶ 2.

Section 523 of the Bankruptcy Code prohibits the discharge of an individual debtor from any debt incurred by embezzlement or larceny.  11 U.S.C. § 523(a)(4) (2006).  This Court has defined "embezzlement" as "the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come."  *In re McKnew*, 270 B.R. at 631 (citing *Johnson v. Davis* (*In re Davis*), 262 B.R. 663, 671 (Bankr. E.D. Va. 2001); *Hyman Wholesale Corp. v. Allman* (*In re Allman*), 147 B.R. 122, 125 (Bankr. E.D. Va. 1992);  *Hall v. Blanton* (*In re Blanton*), 149 B.R. 393, 394 (Bankr. E.D. Va. 1992)*; Va. Comm'n. of Game & Inland Fisheries v. Myers* (*In re Myers*), 52 B.R. 901, 904

---

[20] The Court infers that counsel for OSB intended to allege a claim of larceny against Hathaway when stating that Hathaway "stole" United States Currency belonging to OSB.

(Bankr. E.D. Va. 1985).  Larceny is the "fraudulent or wrongful taking and carrying away of the property to the taker's use without the consent of the owner." *In re Davis*, 262 B.R. at 672 (citing 4 *Collier on Bankruptcy* at ¶ 523.10[2]).  Embezzlement is distinguishable from larceny because the original acquisition of the property was lawful, or at least with the consent of the owner, unlike with larceny, where there is a requirement that felonious intent exist at the time of the taking.  *In re Davis*, 262 B.R. at 671 (citing *Gore v. Kressner* (*In re Kressner*), 155 B.R. 68, 73-74 (Bankr. S.D.N.Y. 1993), *aff'd*, 152 F. 3d 919 (2d Cir. 1998); *Werner v. Hofmann* (*In re Hofmann*), 144 B.R. 459, 464 (Bankr. D.N.D. 1992), *aff'd*, 5 F. 3d 1170 (8th Cir. 1993)).  Neither an embezzlement nor larceny must occur to require the debtor was acting in a fiduciary capacity for the purposes of 11 U.S.C. § 523(a)(4); therefore, to prevail on a claim of non-dischargeability due to larceny or embezzlement, a creditor is not required to show the debtor undertook the alleged wrongful acts while "acting in a fiduciary capacity." *Rountrey v. Lee* (*In re Lee*), 90 B.R. 202, 208 (Bankr. E.D. Va. 1988) (citing *Great Am. Ins. Co. v. Storms* (*In re Storms*), 28 B.R. 761, 764-65 (Bankr. E.D.N.C. 1983); *Va. Comm'n. of Game and Inland Fisheries v. Myers* (*In re Myers*), 52 B.R. 901, 905 (Bankr. E.D. Va. 1985)).

To establish embezzlement, the plaintiffs must prove (1) the debtor's appropriation of property was for the debtor's benefit and (2) the appropriation occurred with fraudulent intent or by deceit.  *Weigend v. Chwat* (*In re Chwat*)*,* 203 B.R. 242, 247 (Bankr. E.D. Va. 1996) (citing *Clark v. Taylor* (*In re Taylor*), 58 B.R. 849, 855 (Bankr. E.D. Va. 1986)).  Thus, in order to prevail, a creditor must establish that the debtor appropriated the funds with

fraudulent intent; "[e]ven where a case might imply some sort of trust by virtue of a debtor

holding funds for another, the debtor's subsequent appropriation of the funds will not amount

to an embezzlement absent proof of the debtor's fraudulent intent." *Hall v. Blanton* (*In re*

*Blanton*), 149 B.R. 393, 394 (Bankr. E.D. Va. 1992) (quoting *Va. Comm'n. of Game and*

*Inland Fisheries v. Myers* (*In re Myers*), 52 B.R. 901, 905 (Bankr. E.D. Va. 1985)).   The

court may infer intent from the debtor's actions and surrounding circumstances. *Id.* (citing

*Moonan v. Bevilacqua* (*In re Bevilacqua*), 53 B.R. 331, 334 (Bankr. S.D.N.Y. 1985)); *see*

*also In re Chwat*, 203 B.R. at 249. The proper inquiry for the court concerning the intent of

the debtor is whether there is "[in]tent to convert, not intent to harm." *In re Taylor*, 58 B.R.

at 855. Thus, ill will toward the plaintiff is unnecessary, and a plaintiff "need not prove that

the debtor acted out of spite, ill will, or hatred in order to prove embezzlement within the

meaning of section 523(a)(4)." *Id.*

As the monies of OSB initially lawfully came into the control of Hathaway as an

authorized signatory on the SouthTrust banking account, per the testimony of both Hathaway

and Worrell, the facts do not support a claim of larceny, because no fraudulent or wrongful

taking without OSB's consent occurred.  OSB duly appointed Hathaway as a Manager who

ran the day-to-day operations of OSB, including the handling of all finances and

disbursements of money. He continued in this responsibility until relieved of his duties, upon

the discovery by the Worrells of the excessive monies withdrawn and unauthorized checks

written for personal use, specifically checks written to pay Hathaway's personal rent and

utilities. As OSB empowered him to conduct its financial affairs, including allowing him to

perform most transactions online and through the use of Quickbooks® software, including disbursement of monies to third parties, Hathaway effectively had the authority to manage the monies deposited into OSB; thus, having come into control of the monies of OSB lawfully, the evidence cannot support a conclusion that Hathaway committed larceny. Thus, it remains for the Court to decide if Hathaway committed embezzlement.

The fact that Hathaway wrote the checks in his capacity as Manager of OSB is of no moment. "The act of embezzlement is committed by an individual, and that individual will not be permitted to shield himself from dischargeability for fraud by asserting he was acting as an employer/officer of the corporation." *Sohoio Chem. Co. v. Berkemeier*, 51 B.R. 5, 6 (Bankr. S.D. Ind. 1983). This rule is particularly true where a debtor acted as an officer and manager of a corporation. *Id.* Hathaway repeatedly drew personal rent and utility checks against OSB. As was the case with the credit cards, Hathaway repeatedly testified that he was specifically authorized by Worrell to pay his rent with corporate funds. Hathaway, again cannot point to any particular interaction with Worrell; he merely stated that the issue was "openly discussed." However, Worrell has equally maintained that he was unaware that Hathaway was using corporate funds to pay his personal rent. Once again, this Court believes that Worrell's testimony is the more credible rendition of the events which transpired.

Several discrepancies with regard to the rent checks cause this Court concern. First, unlike the majority of checks drawn against OSB, the rent checks were handwritten. However, a large majority of the checks appear to be computer-generated. Second, unlike

34

the majority of checks drawn against OSB, the rent checks were signed only by Hathaway. Third, three of the four checks discussed during Hathaway's testimony lacked accurate corresponding check stubs in OSB's check ledger. Pl. Ex. 62, Check stubs from Wachovia Bank Business Account, dated Nov. 2, 2004 to Jan. 20, 2005. According to the evidence presented at trial, the check ledger did not accurately reflect the checks which were written. Specifically, the corresponding check stubs for three of Hathaway's rent and utility checks reflected descriptions such as, "void" or "void, misprint." Hathaway testified that he did not recognize the handwriting on two of these check stubs, however, on the third check stub, he testified that the word "void" was written in his handwriting. When asked for an explanation, Hathaway could provide none. In reviewing this situation with the fact that Hathaway was solely in control of the financial affairs of the company, and that Worrell testified his only consistent act of oversight was to review the check ledger, this Court can infer that Hathaway intended to deceive Worrell and convert corporate funds for his own personal gain in the form of personal rent and utility payments. This Court therefore concludes from the surrounding circumstances that Hathaway was not authorized to pay his personal rent and utilities with corporate funds, and he did so with intent to permanently deprive OSB of these funds.

An officer's unauthorized withdrawal of corporate funds for compensation constitutes embezzlement within the meaning of § 523(a)(4), rendering the resulting corporate debt non-dischargeable. *Ferraro v. Phillips* (*In re Phillips*), 185 B.R. 121, 129 (Bankr. E.D.N.Y. 1995); *Hall v. Johann* (*In re Johann*), 125 B.R. 679, 681-82 (Bankr. M.D. Fla. 1991).

Hathaway's drawing of personal rent and utility checks against OSB was not authorized by OSB or Worrell and was done by Hathaway with the intent to permanently deprive OSB of these monies. As such, his acts constitute embezzlement pursuant to 11 U.S.C. § 523(a)(4) and warrant denial of the discharge of indebtedness he owes to OSB by reason of these unauthorized withdrawals.

### C. Does the Settlement Preclude the Dischargeability Claim?

The Court, having found that the debts incurred by Hathaway satisfy the exceptions to discharge under §§ 523(a)(2) and (a)(4) finds that the debt is not dischargeable in bankruptcy. However, the issue remains as to whether the settlement agreement reached by both Hathaway and OSB will preclude OSB's fraud claims against Hathaway. The United States Supreme Court, in *Archer v. Warner*, addressed this particular issue, and in accordance with this decision, this Court finds that the settlement agreement does not preclude a finding of nondischargeability. 538 U.S. 314 (2003).

In *Archer*, a lawsuit was initiated by the Archers under the claim of a fraudulent sale of a manufacturing company to them by the Warners. The lawsuit was settled, and the Warners agreed to pay a fixed sum of money to compensate for damages connected with the sale. Specifically, the settlement contained language which stated that the Archers would "'execute releases to any and all claims . . . arising out of this litigation. . .'" *Id.* at 317. The releases were later executed, and the Warners executed a promissory note for the remaining settlement amount. The Warners never paid on the note and subsequently filed for bankruptcy. The Archers asked for the remaining debt on the note to be found

36

nondischargeable, alleging that the debt had been procured by fraud.

The Supreme Court analyzed what, at the time, was a split among the circuits over whether the settlement agreement constituted a novation. Under the novation theory, which the Fourth Circuit had adopted,

> the settlement agreement, releases, and promissory note had worked a kind of 'novation.' This novation replaced (1) an original potential debt to the Archers for money obtained by fraud with (2) a new debt. The new debt was not for money obtained by fraud. It was for money promised in a settlement contract. And it was consequently dischargeable in bankruptcy.

*Id.* at 318 (citing *Archer v. Warner* (*In re Warner*), 283 F.3d 230 (4th Cir. 2002). However, the Supreme Court went on to say that to determine a debt "for money promised in the settlement agreement" is not the end of the inquiry. "We must decide whether that same debt can *also* amount to a debt for *money obtained by fraud*, within the terms of the nondischargeability statute." *Id.* at 319. Following its decision in *Brown v. Felson*, which involved a state-court judgment, rather than a settlement agreement, the Court stated that "[c]laim preclusion did not prevent the Bankruptcy Court from looking beyond the record of the state-court proceeding and the documents that terminated that proceeding . . . in order to decide whether the debt at issue . . . was a debt for money obtained by fraud." *Id*. at 320 (citing *Brown v. Felson*, 442 U.S. 127, 138-39 (1979)).

In conclusion, the Supreme Court stated that the Bankruptcy Code required that courts look behind a settlement agreement to determine if the debt in question was originally the product of fraud. Citing *Brown*, the Court stated that "'the mere fact that a conscientious creditor has previously reduced his claim to judgment should not bar further inquiry into the

true nature of the debt.'" *Id.* at 320-21 (citing *Brown*, 442 U.S. at 138).  The Court added that

"'Congress intended the fullest possible inquiry' to ensure that 'all debts arising out of' fraud

are 'excepted from discharge,' no matter what their form." *Archer*, 538 U.S. at 321 (citing

*Brown*, 442 U.S. at 138).  Finally, the Court concluded by stating that "[t]he dischargeability

provision applies to all debts that arise out of fraud." *Id.*  Since *Archer v. Warner*, this

District has interpreted the Supreme Court's mandate:

> [S]o long as the creditor can prove that the debtor fraudulently took something
> of value, such as money, property, or services from the creditor, then any
> damages resulting from that fraud are non-dischargeable under section
> 523(a)(2)(A). In *Archer*, the creditors had already established that the debtors
> had fraudulently received money from the creditors as a result of the sale of
> the company. Thus, the type of fraud contemplated in § 523(a)(2)(A) had
> occurred, and the creditors were entitled to any damages resulting from such
> fraud, including damages for emotional distress and personal injury.

*Nunnery v. Rountree* (*In re Rountree*), 330 B.R. 166, 174-75 (E.D. Va. 2004), *aff'd*, ___

F.3d ___, 2007 WL 586568 (4th Cir. 2007). This Court finds that it is obligated under *Archer*

to look behind a settlement agreement reached by the parties to determine if such debt arose

out of fraud.  Regardless of any release which may have been executed by the creditor, or any

potential novation, if the particular debt arose out of fraud, then this Court may find the debt

to be nondischargeable, no matter its current form.  In this particular case, it is therefore

irrelevant whether the Worrells did in fact release their claims of fraud against Hathaway.

If the debt, which is the subject of the settlement agreement, arose out of fraud, then the debt

will be nondischargeable.

Shortly after the Worrells became aware of Hathaway's actions, they arranged for

Hathaway to write and execute two different handwritten Notes.  In these Notes, Hathaway agreed to waive any claims which he may have against OSB and agreed to pay OSB $25,000.00 by July 15, 2005, as well as an additional $22,370.00 to reimburse the company for personal expenses.  Furthermore, Hathaway also agreed in the handwritten Notes to pay an additional $15,000.00 by October 31, 2005 for debt on the American Express card.  These handwritten Notes were later memorialized in a Promissory Note for $40,000.00 dated August 29, 2005.  Hathaway claimed that this Promissory Note was part of a larger settlement in which he agreed to forego any claims against OSB for unpaid salary, return his stock, execute the note and in return he would be released from all claims made by OSB against him.

Hathaway urges the Court to conclude that he was effectively released upon entry into this larger settlement and therefore would have no remaining obligation to repay the Promissory Note, without regard to his receipt of a discharge in this bankruptcy proceeding. In other words, Hathaway states he was released from any further repayment to OSB by simply signing the Promissory Note, with no obligation thereafter to repay it.  OSB, to the contrary, represents any settlement with Hathaway was conditional upon repayment by Hathaway of the Promissory Note.  It appears to the Court, based upon the testimony at trial and a review of the documents exhibited, that the intended agreement of Hathaway and OSB, after payment of certain monies by Hathaway to OSB and a surrender of his shares of stock, was for any then remaining obligation of Hathaway to OSB to be represented by the Promissory Note.  Hathaway's position that merely signing the Promissory Note effected a

full release by OSB of all obligations (including the Promissory Note) makes little sense.

Rather, it appears Hathaway and OSB intended that the Promissory Note would represent any

remaining claim under state law against Hathaway.[21]  Having concluded that no release of

the Promissory Note occurred by reason of any compromise, the question then that this Court

must answer is whether the debt, which is the subject of the Promissory Note, arose out of

fraud.

The Promissory Note was executed in order to reimburse OSB for Hathaway's misuse

of the corporate credit cards and also for his unauthorized use of corporate funds to pay his

personal rent and utilities.  This Court has already determined that these actions constituted

fraud under the Bankruptcy Code.  As such, the debt created by Hathaway's actions, which

was the subject of the Promissory Note of August 29, 2005, arose out of fraud.  The debt

therefore, is nondischargeable, despite the fact that Hathaway claims that OSB has released

him from any fraud claims.

### D.  Clean Hands Doctrine

Hathaway additionally asserts as a defense to the claim of OSB that OSB comes into

this proceeding with "unclean hands," and the Bankruptcy Court, being a court of equity, is

therefore precluded from finding the debt of Hathaway to OSB as not discharged.  Case law

---

[21] The corollary of this conclusion is that, upon default in repayment of the Promissory
Note, any claim by OSB would be limited to amounts owed under the Promissory Note and OSB
could not enlarge its claim to include any other amounts allegedly owed to OSB by Hathaway
prior to the compromise.  As a practical matter, OSB apparently only seeks to recover under the
Promissory Note and has reduced its claim to an amount less than the face amount of the
Promissory Note.

40

requires that in order to invoke the affirmative defense of unclean hands, there must be a

specific nexus between the alleged misconduct of the moving party and the transaction of

which he is complaining.  "A court can deny relief under the doctrine of unclean hands only

when there is a close nexus between a party's unethical conduct and the transactions on

which the party seeks relief." *Uwimana v. Republic of Rwanda* (*In re Uwimana*), 274 F.3d

806, 810 (4th Cir. 2001) (citing *Keystone Driller Co. v. General Excavator Co.*, 290 U.S.

240, 245 (1933); *Wetzler v. Cantor*, 202 B.R. 573 (D. Md. 1996); *see also McGovern v.

Deutsche Post Global Mail, Ltd.*, 2004 WL 1764088, at *10 (D. Md. 2004). The moving

party's hands must be clean with respect to the specific transaction to which he seeks relief.

He is not required to come to court with generally clean hands.  "This is so because the

doctrine 'has nothing to do with disapproval of the character or past behavior of the applicant

but only with the effect of his present application.'" *Wetzler v. Cantor*, 202 B.R. 573, 577 (D.

Md. 1996) (quoting *Niner v. Hanson*, 217 Md. 298, 309 (1958) (holding that despite moving

party's alleged self-dealing, this action was "in no way connected to the present claim" which

was on a claim for contribution of a settlement agreement); *see also Keystone Driller Co.*,

290 U.S. at 147-48 ("But courts of equity doe not make the quality of the suitors test.  They

apply the maxim requiring clean hands only where some unconscionable act of one coming

for relief has immediate and necessary relation to the equity that he seeks in respect of the

matter in litigation.").  Hathaway's burden, therefore is to prove that any misconduct of OSB

or Worrell directly relates to and affects his misuse of the credit cards or the embezzlement

of corporate funds.

41

Furthermore, courts also require that the misconduct in question be of a nature so as to place a fraud on the court itself, not necessarily on either party. "The clean hands doctrine was designed to safeguard the judicial process, not to protect the parties." *McGovern*, 2004 WL 1764088 at *10 (citing *Smith v. Cessna Aircraft Co.*, 124 F.R.D. 103, 106 (D. Md. 1989). The actions must be such that they impair the court's ability to effectuate a proper finding in a case, "where plaintiff's unethical behavior has worked a fraud on the court and undermined the judicial process." *Id.*

In the case of *In re Bromley*, the Bankruptcy court dealt with the application of the unclean hands doctrine to a dischargeability claim. There the plaintiff was "not entitled to relief from a court of equity in the form of an order denying the dischargeability of debt." *Hutchinson v. Bromley* (*In re Bromley*), 126 B.R. 220, 223 (1991). The plaintiff's hands were unclean because he specifically aided in the very transaction against which he was seeking relief. The plaintiff reluctantly participated in a fraud with the debtor against the bank, by borrowing money over his need in order to pay the debtor who was a loan officer of the bank. *Id.* The plaintiff then brought a dischargeability claim for this loan against the debtor loan officer. *Id.* The court here found that because of the plaintiff's participation in the fraud, he did not have clean hands to claim that the debt was nondischargeable. *Id.* Additionally, the Court distinguished this case from situations where a surety becomes liable for a bad debt, noting that sureties are innocent of the bad behavior of the debtor, whereas in the case at hand, the plaintiff was liable to the bank as an actual accessory. *Id.* at 223. Because the plaintiff directly aided in the fraudulent transaction, albeit with great hesitation,

his direct involvement in the transaction was enough to trigger the clean hands doctrine.

The Fourth Circuit, in the case of *Uwimana v. Republic of Rwanda*, found that a sufficient nexus did not exist between the bad acts of the moving party and the transaction for which it sought relief. 274 F.3d 806 (2001). There, the Republic of Rwanda claimed that government funds were used by Uwimana in his authority as Ambassador to fund asylum applications in light of the recent takeover by the Rwandan Patriotic Front (RPF). Rwanda claimed that this debt was nondischargeable because is resulted from Uwimanas' defalcation while acting as a fiduciary for the Republic of Rwanda. The Uwimanas in turn argued that Rwanda's claim was barred by the doctrine of unclean hands because it was seeking to persecute the Uwimanas for their political beliefs, thus forcing the debtors to seek asylum in the United States. The Court held that this nexus was not enough, noting that no evidence was ever presented which would have suggested that Rwanda was responsible for the Uwimana's decision to spend the funds, nor did the Uwimanas ever state that they spent the money on asylum in order to avoid punishment by Rwanda. Instead the Court determined only that the threat of civil unrest caused the Uwimanas to seek asylum, not any direct threats from the government itself. It can be inferred that had there been evidence presented showing that Rwanda was directly involved in the Uwimanas' decision, either by threatening the couple or misleading them, this would have provided a sufficient nexus where the unclean hands doctrine may have been invoked.

Thus, in order for Hathaway to prevail in convincing this Court that this is a situation in which he may invoke the unclean hands doctrine as an affirmative defense, he must

demonstrate that there is a direct nexus between his unauthorized use of corporate credit cards or his embezzlement of corporate funds and the alleged bad acts of the Worrells or OSB.  While Hathaway has alluded to evidence of self-dealing on the part of the Worrells, he has never pointed to corroborating evidence that the actions of OSB would show he was authorized by Worrell to use the credit cards for personal transactions, or pay his personal rent with OSB funds.

This Court specifically stated in its denial of the Motion for Summary Judgment, that it could not conclude as a matter of law that unclean hands would operate as a defense and specifically *reserved* judgment as to whether such evidence of "unclean hands" on the part of OSB would have any relevance to the determination of nondischargeability of the debt owed by Hathaway to OSB.  It is important to note that Hathaway did not present any evidence to this Court at trial with regard to his defense of unclean hands, besides his own personal testimony that Worrell specifically authorized his personal use of the cards, and permitted him to pay his personal rent with company funds.  This being said, the Court has chosen to examine the arguments submitted by Hathaway in the pleadings. In his Answer to the Complaint, Hathaway claimed he was entitled to invoke the clean hands doctrine because Worrell, as Manager of OSB had:

> been sole owner; that Worrell continued as the Alter Ego of OSB, regularly self-dealing with company money; Worrell regularly paid his personal debts from OSB accounts or receivables; Worrell regularly paid his monthly equity loan; Worrell obtained a corporate credit card, *Ultra Vires*, for which Worrell never accounted to OSB; Worrell paid for family vacations, bills and expenses; that Worrell did not act in good faith or OSB's benefit; Worrell regularly directed, instructed or informed Hathaway that Worrell had the absolute right,

44

authority and responsibility for how the corporate bylaws, corporate books,
minutes of the shareholders meetings or officers, managing directors, etc were
typically maintained and kept; that Worrell held in his possession all business
records, customer accounts, corporate books and records in his office at all
times.

Answer at 6.  These allegations, even if proven true, only point to the general reprehensible

conduct of an irresponsible Manager.  While this Court certainly would never condone any

of these alleged activities, none of the activities cited by Hathaway would provide a

sufficient nexus which could have affected Hathaway's own wrongdoing such that Hathaway

would be absolved from his fraudulent acts.  Even if Worrell were proven to pay his personal

debts through company funds, and even if Worrell were proven to have opened his own

credit card account, such behavior does not specifically affect whether or not Hathaway was

authorized to use corporate credit cards for his own personal transactions, nor does it

authorize or directly affect Hathaway's embezzlement of OSB funds.

In his Motion for Summary Judgment, Hathaway again raised the issue of unclean

hands, this time specifically accusing the entity of OSB of alleged bad acts.  In his motion

he notes that OSB:

> (1) committed fraud on shareholders buy conveying corporate money to
> Steven and Laurie Worrell; and (2) OSB intentionally concealed the diversion
> of $55,000 capital investment paid OSB for 50% of its stock to the personal
> bank account of Steven and Laurie Worrell; and (3) OSB commingled
> company assets and finances with those of Steven and Laurie Worrell
> personally; and (4) OSB used corporate assets and money to pay personal
> debts of Steven and Laurie Worrell; and (5) OSB established and concealed a
> secret corporate bank account. . .

Motion for Summary Judgment and Memorandum, at 5-6.  None of these alleged actions

would specifically direct Hathaway to be authorized to conduct his own self-dealings against the company.  Hathaway has not provided this Court with any evidence, other than his own testimony, that Worrell has given him any indication or performed any act which would have authorized Hathaway to use the corporate cards for personal transactions, or pay his personal rent with OSB funds.  To be sure, there is a tenuous argument which could have been presented by Hathaway, that, if Hathaway was aware of self-dealing on the part of Worrell, then he could infer that his own actions would also be authorized.  However, case law requires a much stronger nexus between Hathaway's specific actions and those alleged bad acts of Worrell.  Case law suggests that Worrell's actions must be of the type which directly caused or aided Hathaway in carrying out his own transactions.  Courts have noted a nexus exists where a plaintiff has specifically participated in the fraudulent act in question, however, when the plaintiffs have merely committed fraudulent acts which have no bearing on the subject matter of the claim, the Courts decline to find a nexus strong enough to invoke the Clean Hands Doctrine.  Mere self-dealing, while unethical, does not arise to causing another Manager to conduct his own self-dealing.

Furthermore, the evidence at trial showed no usage by Worrell of the credit cards of OSB which form the basis of the Complaint here.  As such, any defense of unclean hands asserted here by Hathaway is insufficient to prevent a recovery by OSB.

### E.  Amount of Nondischargeable Debt

While the Promissory Note purported that debt incurred by Hathaway amounted to $40,000.00, it has become apparent to this Court through both Worrell's testimony and the

argument of Counsel for OSB, that the actual damages now claimed by OSB is less than this amount ($40,000.00),[22] which was the original prayer for relief contained in OSB's Complaint.  Compl. ¶ 2.  Worrell testified that the total amount of debt resulting from the misuse of the American Express card amounted to $11,258.62.   Additionally, Worrell testified that Hathaway had charged $23,149.35 in personal expenses against the SouthTrust bank account, both through unauthorized transactions on the Visa check card and his embezzlement of corporate funds.  In his closing argument, Counsel for OSB stated that OSB's claim was not for the $40,000.00 amount of the Promissory Note, but the total of these two attested amounts to which Worrell had testified: $34,407.09.[23]  Counsel for OSB agreed at the trial that OSB now seeks a lesser amount than represented in the Promissory Note.  Given the evidence adduced at trial, and the concluding prayer for relief from Counsel in his closing argument, as well as the Court's determination that the debt represented by the Promissory Note was incurred by reason of the misuse of corporate credit cards and embezzlement of corporate funds, the debt is nondischargeable, and this Court, by reason of the reduction in amount sought by OSB, determines that there is a total of $34,407.09 in nondischargeable debt owed to OSB by Hathaway.

---

[22] While the Promissory Note indicates a debt of $40,000.00, OSB originally claimed $45,000.00 in nondischargeable debt which purportedly included attorney fees and costs. Compl. ¶ 2.

[23]  The Court notes that the actual sum is $34,407.97, which is the sum of the American Express credit card debt ($11,258.62) and the amount charged against SouthTrust ($23,149.35).

F. Attorney's Fees

The Promissory Note contains a provision for an award of attorney fees, of twenty-five percent (25%), in the event collection efforts on the Note must be made. Pl. Ex. 52, Promissory Note, dated Aug. 29, 2005. Further, the Court has found that $34,407.09, of the $40,000.00 Note is nondischargeable. Thus, any assessment of attorney fees must account for these facts. Worrell testified that he expended $11,261.93 in attorney fees. Hathaway did not dispute this amount.

This court has previously examined the bases for an award of attorney fees in a § 523(a)(2) fraud exception to dischargeability. *See Elrod v. Bowden* (*In re Bowden*), 326 B.R. 62, 97-102 (E.D. Va. 2005). The United States Supreme Court announced the general rule regarding the award of attorney fees in *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240 (1975). There, the Supreme Court held that, absent a statute or enforceable contract, "[i]n the United States, the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser." *Id.* at 247-57.

The Supreme Court has considered the issue of an award of attorney fees in the specific context of the 11 U.S.C. § 523(a)(2) fraud exception to dischargeability. In *Cohen v. De La Cruz*, 523 U.S. 213 (1998), a locality administrator, pursuant to a rent control ordinance, ordered the landlord, Cohen, to refund certain rent overcharges to various tenants. *Id.* at 215. Cohen thereafter filed a petition under Chapter 7 of the Bankruptcy Code, and the tenants responded by filing a complaint to deny the dischargeability of their debt from Cohen pursuant to Section 523(a)(2)(A). *Id.* The tenants were awarded punitive damages, attorney

48

fees, and costs under a New Jersey consumer fraud statute. Cohen appealed and sought

discharge of the punitive damages and attorney fees. *Id*. at 216.

The Court concluded that the language and history of § 523 required more than

restitution, and the "debt" obtained by fraud included treble damages and attorney fees:

> In short, the text of § 523(a)(2)(A), the meaning of parallel
> provisions in the statute, the historical pedigree of the fraud
> exception, and the general policy underlying the exceptions to
> discharge all support our conclusion that "any debt . . . for
> money, property, services, or . . . credit, to the extent obtained
> by" fraud encompasses any liability arising from money,
> property, etc., that is fraudulently obtained, including treble
> damages, attorney's fees, and other relief that may exceed the
> value obtained by the debtor.

*Id*. at 223.

Cases decided subsequent to *Cohen* have applied the holding in the context of other

state statutes permitting an award of attorney fees. *See, e.g.*, *Fowler v. Garey* (*In re Garey*),

258 B.R. 356, 361-62 (Bankr. E.D. Va. 2000) (considering an award of attorney fees under

the Virginia Consumer Protection Act). Other cases have considered *Cohen* in the context

of non-statutory contractual provisions permitting an award of attorney fees. *Wegman's*

*Food Markets, Inc. v. Lutgen* (*In re Lutgen*), No. 98-CV-0764E, 1999 WL 222605

(W.D.N.Y. Apr. 5, 1999) is illustrative. There, the debtor, Lutgen, had entered into a check-

cashing agreement with Wegman's where Lutgen had stipulated to pay, in the event of

default, all of Wegman's costs of collection, including attorney fees. Wegman's argued that

*Cohen* excepted from discharge its contractual claim of attorney fees. The bankruptcy court

disagreed, finding *Cohen* did not address dischargeability of legal fees in the absence of a

state statute permitting their award, and therefore, the "American Rule" was relied upon to

have each litigant bear its own legal expenses.  *Id*. at *1.

The District Court noted that a number of courts in other circuits had concluded that a debtor's contractual obligation to pay a creditor's collection costs, including attorney fees, is non-dischargeable when such costs are incurred in obtaining a judgment of nondischargeability under Section 523(a)(2) with respect to money obtained from that creditor through fraud.  *Id*. at *2 (citing *Alport v. Ritter* (*In re Alport*), 144 F.3d 1163, 1167-68 (8th Cir. 1998); *In re Sheridan*, 105 F.3d 1164, 1166 (7th Cir. 1997); *Luce v. First Equip. Leasing Corp.* (*In re Luce*), 960 F.2d 1277, 1286 (5th Cir. 1992); *TranSouth Fin. Corp. of Florida v. Johnson*, 931 F.2d 1505, 1506-09 (11th Cir. 1991); *Martin v. Bank of Germantown* (*In re Martin*), 761 F.2d 1163, 1167-68 (6th Cir. 1985)).  The District Court concluded that the reasoning of *Cohen* supported the nondischargeability of a debtor's contractual obligation to pay collection costs:

> This Court finds that the reasoning underlying the decision in *Cohen* supports the rule of the above-cited line of cases and that such rule governs this case.  Wegmans claims—and Lutgen has foregone his opportunity to deny—that it has a contractual right to payment of any attorney's fees it incurs in collecting on Lutgen's bad checks.  Judge Kaplan's reasoning—that such right is unenforceable because Lutgen has since filed a petition seeking bankruptcy relief and that he is therefore entitled to a discharge of any contractual obligation—evinces a faulty analysis.  This Court finds that, under *Cohen*, the proper inquiry is whether—irrespective of the circumstance that the debtor has filed a bankruptcy petition—the defrauded creditor has a right to payment that is enforceable under state law.  It is established that Wegmans had such a right; there is no claim that its right is not enforceable under state law.  Consequently, Wegmans' right to payment of its attorney's fees constitutes a "debt" that, having resulted from Lutgen's fraud, is non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

*Id.* at *3.  *See also Merchants Nat'l Bank of Winona v. Moen* (*In re Moen*), 238 B.R. 785,

50

795-96 (8th Cir. B.A.P. 1999) (attorney fees were properly awarded where "[t]he terms of the Equity Credit Agreement unequivocally provide [the debtor] will pay the reasonable attorney's fees expended by Merchants to collect any debt which arose out of [the debtor's] use of the special purpose checks."). Accordingly, "after *Cohen*, the determinative question in cases under § 523(a)(2) is whether the successful plaintiff could recover attorney's fees in a non-bankruptcy court." *AT&T Universal Card Servs. Corp. v. Hung Tan Pham* (*In re Hung Tan Pham*), 250 B.R. 93, 99 (9th Cir. B.A.P. 2000); *accord, Buffalo Gyn Womenservices, Inc. v. Behn* (*In re Behn*), 242 B.R. 229, 241 (Bankr. W.D.N.Y. 1999).

While a provision in a note to pay an attorney's fee incurred in collecting the note is binding on the parties to the note, a Virginia court has the power to reduce the amount if found to be unreasonable or unconscionable. *First Am. Bank v. McDonald*, 30 Va. Cir. 299, 1993 WL 946014, at *1 (Va. Cir. Ct. 1993) (citing *Richardson v. Breeding*, 167 Va. 30, 33, 187 S.E. 454, 455 (1936); *Cox v. Hagen*, 125 Va. 656, 673, 100 S.E. 666, 673 (1919); *Triplett v. Second Nat'l Bank*, 121 Va. 189, 193, 92 S.E. 897, 898 (1917)). However, a fee stipulated by contract is *prima facie* reasonable and should be paid unless excessive or unreasonable. *Id.* at *2 (citing *Parksley Nat. Bank v. Accomac Banking Co.*, 166 Va. 459, 462, 186 S.E. 38, 39 (1936); *Conway v. Am. Nat'l Bank of Danville*, 146 Va. 357, 364-65, 131 S.E. 803, 805 (1926)). "Thus, the burden is on the defendant to prove that the plaintiff did not incur the amount expressed in the agreement or that the fee agreed upon was excessive or unreasonable." *Id.* (citing *Conway*, 146 Va. at 364-65, 131 S.E. at 805).

This Court finds that a Virginia court would not reduce the attorney fees provided for in the Note on the basis of unreasonableness or unconscionability. Here, the Note provides for payment of "all expenses incurred" of a suit to collect the Note, "including twenty-five (25%) percent attorney's fees." Pl. Ex. 52, Promissory Note, dated Aug. 29, 2005. The

51

provisions of the Note, therefore, stipulate attorney fees of twenty-five percent (25%) of the Note.[24] Worrell testified that he expended $11,261.93 in attorney fees. However, because this Court only found $34,407.09 of the $40,000.00 Note to be nondischargeable, it is that amount which should be calculated. Thus, reasonable attorney fees in this instance would be calculated as twenty-five percent (25%) of $34,407.09, or $8,601.77.[25] As a presumption of reasonableness attaches to the percentage fixed for attorney fees in the Note to cover the attorney fees incurred and anticipated, and no evidence was adduced by Hathaway to contravene this presumption, this Court believes a Virginia court would award OSB attorney fees equal to twenty-five percent (25%) of the balance of the Note (or in this case, the balance of the debt found to be nondischargeable) at the time of the initiation of the Complaint.

The Note plainly provides for attorney fees in the amount of twenty-five percent (25%) in the event that action is taken to collect on the Note. That condition is clearly met here. With that condition met, the Court finds that Hathaway is liable for attorney fees in the amount of $8,601.77 (twenty-five percent of the $34,407.09 amount that the Court has determined to be nondischargeable). Because the attorney fees are being awarded on the basis of contract law and not as an application for compensation before this Court under the Bankruptcy Code, this Court concludes that further evidence as to the reasonableness of the

---

[24] Because the clause includes a specific percentage, it appears the intent of this provision is to provide for an award of the attorney fees based upon the agreed percentage therein. This provision also omits a description that the agreed-upon fees are a percentage of the outstanding balance of the Note, but the context of this language drafted by the parties convinces the Court that the intention of the parties was that the agreed-upon fees are twenty-five percent of the balance of the Note, as is commonly provided for in similar instruments.

[25] Had this Court determined that OSB could recover the entirety of the Note, OSB would still only be able to collect an award of $10,000.00 in attorney fees, under the terms of the Note.

amount of the attorney fees is not needed.

### IV. CONCLUSION

Having found that Hathaway's actions satisfy the exceptions to discharge under Sections 523(a)(2)(A) and (a)(4), and after following the Supreme Court's mandate in *Archer v. Warner* requiring this Court to look at the true nature of a debt to determine dischargeability, this Court finds that the amount of $34,407.09 constitutes non-dischargeable debt owed by Hathaway under the Bankruptcy Code. Further, the Court finds that Hathaway is liable for attorney fees in the amount of $8,601.77. Accordingly, the Court enters judgment against Hathaway in favor of OSB in the amount of $43,008.86, which judgment is nondischargeable pursuant to Sections 523(a)(2)(A) and (a)(4) of the United States Bankruptcy Code.

A separate order will issue.

The Clerk shall deliver copies of this Opinion to Timothy V. Anderson, Counsel for OSB Manufacturing, Inc.; and Dale V. Berning, Counsel for William E.K. Hathaway, II.

**Entered this 6th day of March, 2007, at Norfolk, in the Eastern District of Virginia.**

STEPHEN C. ST. JOHN
United States Bankruptcy Judge